DREW, J.
Lin this medical malpractice action, Donna Dillon appeals a judgment granting the exception of prematurity filed by defendant Dr. Brian Willis, a neurosurgeon who had treated her minor daughter, Candace Allen.
Concluding that Dr. Willis was entitled to have this claim first submitted to a medical review panel, we affirm.
FACTS[1]
When Allen was two years old, a bout with meningitis left her with hydrocepha *1230 lus, cerebral palsy, developmental delay, and seizures. A ventriculoperitoneal shunt was installed to drain fluid away from her brain.
On January 17, 2003,[2] Allen, who was then 13, was treated by Dr. Gerome Thompson for flu-like symptoms. A week later, Allen presented at Springhill Medical Center with flu-like symptoms. On February 3, Allen was brought to the emergency room at Springhill Medical Center, where she was treated for a urinary tract infection and gastroenteritis. Dr. Thompson admitted Allen into Spring-hill Medical Center two days later. At the time, Allen had lower abdominal pain and dizziness and was unresponsive. Dillon reported that over the prior four to five days, Allen had become sleepier, complained of abdominal pain, and refused to walk. Allen was discharged on February 7 with a prescription for Valium and instructions to meet with Dr. Thompson.
On February 8, Allen was examined by Dr. Brent Smith at Willis-Knighton Bossier Health Center (“WK-B”) for complaints of not walking | ¡.normally, abdominal pain, and problems with urination. Allen’s past medical history was listed as including cerebral palsy, mental retardation, and seizure disorder. A urinalysis showed evidence of infection. A CT scan of the brain was limited because of Allen’s movement. Allen was then admitted to the pediatric services of Dr. Thomas Latiolais. During this hospitalization, Dillon alleges that she informed the staff and physicians at WKB that Allen was staring into space and was not seeing correctly.
Allen was examined on a consultation by Dr. Brian Willis at WK-B on February 11. She was agitated during the examination, and her pupils were dilated with minimal constriction to bright light. Dr. Willis noted that Allen’s symptoms were not consistent with a shunt malfunction, but if other causes were ruled out, he would proceed with a shunt tap and possibly an MRI. Dr. Willis also noted that although the CT scan was of marginal quality, it showed no obvious shunt problems. An eye consultation on February 11 showed that accurate visual acuity was obtainable because of Allen’s level of consciousness. Allen’s MRI was later cancelled when a urine toxicology screen was positive for antidepressants and Benzodiazepines.
A skull x-ray taken on February 12 revealed a possible kinking of the shunt’s tubing. According to Dillon, Dr. Willis signed off on Allen’s case on February 13. The next day, Allen was discharged from WK-B. Dillon was advised to take Allen to' LSU Health Sciences Center (LSUHSC) in the event Allen continued to have difficulty with walking or with her vision.
|sOn February 16, Allen was admitted to LSUHSC because of blindness. Allen was again examined by Dr. Willis, and according to Dillon, Dr. Willis again indicated that Allen’s symptoms were not consistent with a shunt malfunction. On February 19, the shunt was revised because there was concern that a shunt malfunction was the cause of the blindness. During the revision, it was discovered that there was kinking as a result of scarring, and there was poor flow beyond the kink. The peritoneal distal catheter was replaced because there was no flow distally. Allen was discharged from LSUHSC on February 27. The diagnosis of Allen’s condition was chronic optic neuritis secondary to elevated intra cranial pressure secondary to malfunctioning of the VP shunt. Allen is now blind and unable to ambulate.
*1231 On January 16, 2004, Dillon’s counsel wrote to the Commissioner of Administration requesting a medical review panel against Dr. Willis and other parties for alleged malpractice that occurred between February 8 and February 14, 2003. The Patient’s Compensation Fund responded on January 28, 2004, that Dr. Willis was not a qualified health care provider under La. R.S. 40:1299.41, et seq.
On February 6, 2004, the Division of Administration wrote to Dillon that Dr. Willis was a qualified health care provider under the Malpractice Liability for State Services Act (“MLSSA”), La. R.S. 40:1299.39, et seq.
Dillon filed suit against Dr. Willis and Springhill Medical Center on March 18, 2004. On November 12, 2004, Dr. Willis filed the exception of prematurity. He asserted that he was a qualified health care provider under |4La. R.S. 40:1299.39. The trial court, concluding that Dr. Willis was a qualified health care provider under La. R.S. 40:1299.39(A)(l)(a)(i), granted the exception of prematurity.
DISCUSSION
At issue in this matter is whether Dr. Willis was a qualified health care provider under La. R.S. 40:1299.39(A)(1)(a)(i) at the time he treated Allen at WK-B.
“All malpractice claims against the state, its agencies, or other persons covered by this Part ... shall be reviewed by a state medical review panel.... ” La. R.S. 40:1299.39.1(A)(l)(a). The burden of proving prematurity is on the exceptor; thus, Dr. Willis must establish that he is entitled to a medical review panel. See Williamson v. Hospital Service District No. 1 of Jefferson, 2004-0451, (La.12/1/04), 888 So.2d 782.
Dr. Willis contends that he is a state health care provider as defined in La. R.S. 40:1299.39(A), which states in part:
(l)(a) “State health care provider” or
“person covered by this Part” means: (i) The state or any of its departments, offices, agencies, boards, commissions, institutions, universities, facilities, hospitals, clinics, laboratories, health care units, ambulances, ambulance services, university health centers, and other state entities which may provide any kind of health care whatsoever, and the officers, officials, and employees thereof when acting within the course and scope of their duties in providing health care in connection with such state entity....
Dillon counters that Dr. Willis is excluded from coverage under the MLSSA because he was not functioning as an employee of the state at the time the alleged malpractice occurred at WK-B. Dillon also argues that | .^coverage is excluded under La. R.S. 40:1299.39 according to the terms found in (A)(1)(b), which provides:
“State health care provider” or “person covered by this Part” shall not mean and shall not include a political subdivision of the state nor any hospital, hospital service district, or any other health care facility of a political subdivision, nor shall it mean or include any individual acting in a professional capacity in providing health care services not by or on behalf of the state.
Discussing the interpretation of the MLSSA, our supreme court has stated:
This court has noted that because the MLSSA limits the liability of certain health care providers in derogation of the general rights of tort victims, any ambiguities in the Act should be strictly construed against coverage. On the other hand, legislation is a solemn expression of legislative will, and therefore, interpretation of a law involves primarily the search for the legislature’s intent. Hence, when a law is clear and unambiguous and its application does not lead to *1232 absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature. When the language of the law is susceptible of different meanings, however, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. Additionally, laws on the same subject matter must be interpreted in reference to each other. If application of the foregoing rules of interpretation fails to illuminate definitively the legislature’s intent, only then should the rule of strict construction apply to the interpretation of laws in derogation of common rights such as the MLSSA.
Citations omitted. Ruiz v. Oniate, 97-2412, pp. 4-5 (La.5/19/98), 713 So.2d 442, 444-5. The supreme court further explained that the purpose of the MLSSA was to entice physicians and other professionals to provide health care to patients on behalf of the state by protecting them against malpractice judgments. Id.
1 (iDr. Willis is a neurosurgeon employed by LSUHSC as a professor. He primarily does “hands-on care for patient care,” but he also trains residents and medical students, and performs research. He works at the main LSUHSC hospital, a satellite clinic, and then once a week at WK-B. He does not have a contract with Willis-Knighton, although his group at LSUHSC, which he refers to as the “University of Neurosurgery,” has an agreement to provide professional services at the Willis-Knighton hospitals. The state rents space for them to have an office in a building at the WK-B complex. Dr. Willis explained that all his employees at the WK-B office are state employees.
Because his group has admitting privileges at the Willis-Knighton hospitals, they are required to take emergency room calls at those hospitals. Dr. Willis explained that he will sometimes see patients at the emergency rooms at those hospitals when he is on call one weekend a month. Dr. Willis also stated that he has admitting privileges at all area hospitals except for those operated by Christus Schumpert. His group is also affiliated with the Veterans Hospital and Shriner’s Hospital, where he does consultations. When Dr. Willis sees patients at WK-B, he is usually not accompanied by medical residents, because WK-B is not accredited as part of the residency training program. Thus, when Dr. Willis is providing services at WK-B, such as when he consulted on Allen’s case, he is acting in his role as a neurosurgeon, not as an instructor.
|7Pr. Willis is paid through the state, and his medical malpractice insurance coverage is through the state.[3] He receives a base salary based upon his level of professorship, and then he receives supplemental pay based on how much money he brings to the department through his clinical practice. A patient whom he sees at WKB is billed through the state for his services as all his billing is done through LSUHSC. The only time that LSUHSC does not bill for medical care provided by Dr. Willis is when he is working as a physician in the military. Dr. Willis was unsure if Allen was billed for the services he provided to her at WK-B.
*1233 Dr. Willis explained that his work at WK-B benefits the state because income he earns for LSUHSC is used to subsidize research and faculties that do not produce much money. Dr. Willis agreed that it would not benefit the state if he did not bill for his services at WK-B, but then he added that under such circumstances it would still benefit the state in the sense that he would be providing services to its citizens.
The record establishes that Dr. Willis was in the course and scope of his employment with LSUHSC when treating Allison at the time of the alleged malpractice. Accordingly, the exception of prematurity was properly granted.
DECREE
At appellant’s costs, the judgment is AFFIRMED.

. The facts regarding Allen's medical history and treatment are gleaned from Dillon's petition and appellate brief.

. All of the medical treatments and diagnoses at issue occurred in 2003.

. Filed into the record is an August 11, 2003, letter from Rogers Prestridge, Coordinator of Legal and Governmental Affairs with LSUHSC, to Willis-Knighton. Prestridge wrote that Dr. Willis was a Professor in the Department of Neuroscience at LSUHSC, and that medical malpractice coverage was extended to Dr. Willis when acting in a professional capacity while providing health care services on behalf of the state. Dr. Willis does not have any separate medical malpractice insurance coverage.